ace

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **KAREN BECKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 06-2226-JAR** |
| | ) | |
| **SECURITAS SECURITY SERVICES** | ) | |
| **USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Karen Becker brings this action against her former employer, Securitas Security

Services USA, Inc. ("Securitas"), alleging that she was terminated from her employment based

on gender discrimination.  This matter comes before the Court on defendant Securitas's Motion

for Summary Judgment (Doc. 70).  The matter is fully briefed, and the Court is now prepared to

rule.  For the reasons set forth below, the Court denies defendant's Motion for Summary

Judgment.

**I.      Uncontroverted Facts**

The following facts are either uncontroverted, stipulated to, or viewed in the light most

favorable to plaintiff.  Defendant is a security company that contracted with Sprint/United

Management Company ("Sprint") to provide security services to Sprint's headquarters in

Overland Park, Kansas ("Sprint campus").  In February 2004, plaintiff was hired by defendant as

the National Command Center Account Manager ("NCC Manager") at the Sprint campus.  On

May 10, 2005, defendant terminated plaintiff's employment.

*NCC Manager Position*

The job description for the position states that the NCC Manager is "responsible for overseeing the entire Command Center operations and staff."  The job description lists "essential functions" of the position that include: ensuring that all post orders are followed and that reports are filed; notifying proper authorities and client in emergency situations; coaching and disciplining personnel as appropriate; and ensuring that staff members are properly trained.  The job description also lists  "competencies" required for the position that include: the ability to supervise staff; the ability to provide direction and motivate high performance; the ability to maintain professional composure when dealing with unusual circumstances; and the ability to adapt to changes in the external environment and organization.  There are also "working conditions," or demands of the job, listed in the job description.  Some of these working conditions include: maintaining composure in dealing with authorities, executives, clients, staff and the public, occasionally under conditions of urgency and in pressure situations; being exposed to stressful situations, such as loud noise, sounding alarms, high volume of incoming telephone traffic, fire, medical or other emergencies; directing and disciplining staff in a positive manner; and performing stressful and physical activity.  Plaintiff testified that a "critically important" part of the position was the ability to give instruction during high stress incidents. Further, if someone were to "melt down" or quit during a time of stress, that person would not be capable of performing the job as NCC Manager.

During her employment, plaintiff was given a copy of defendant's employee handbook, and she was supposed to read and follow it.  This handbook provides a list of certain conduct that may result in immediate termination of employment including: misuse of company or client

telephone or computer; insubordination, derogatory behavior toward supervisory or management

personnel; breach of confidence, including misappropriation or misuse of confidential

information; theft, unauthorized taking or removal of client or company property; serious

misconduct of any kind; disruptive or inappropriate conversations at work; leaving post without

proper relief or authorization from your supervisor or "no call, no show"; willful or repeated

violation of safety rules; participating in any relationship or activity that creates a conflict or

potential conflict of interest, discord or distractions that interfere with the productivity of the

workplace; and repeated failure to accept assignments.

### Smolecki Becomes Branch Manager

In March 2005, Matt Smolecki became the Branch Manager for the Sprint campus, and

he began directly supervising plaintiff in the last few days of March.  Smolecki testified that

plaintiff had a hard time maintaining her composure under stressful conditions during her

employment with defendant.  As an example, there was an incident when two individuals entered

the Sprint parking lot dressed in camouflage and carrying rifles.  Mike Noss, the Security and

Safety Manager for the Sprint campus,[1] observed plaintiff's reaction to that situation and

described her performance as "poor."  When a guard reported the situation to plaintiff, Noss

witnessed plaintiff enter the NCC and announce what had been reported in "an extremely loud,

out of control" tone.  In Noss's opinion, plaintiff's reaction caused her staff to respond

incorrectly to the situation and to be somewhat frustrated and panicked rather than remaining

calm.  Noss heard plaintiff direct the staff to bring up the camera views of the garage.  Then, she

ordered the staff to dispatch the mobile patrols into the garage to look for the two individuals,

---

[1]Noss is employed by Sprint, not defendant.

which was contrary to post orders.  Plaintiff did not call the police until Noss directed her to do so.  Plaintiff failed to call the Corporate Security Department as required, and Noss also had to instruct her to do this.  Noss eventually stepped in and took control of the situation after he determined that plaintiff was not following the correct procedure because he feared someone would get hurt.  Plaintiff's version of this incident is that she did not dispatch the mobile patrol unit, but instead she followed the normal procedure for such a situation.  Also, plaintiff directed a staff member to call 911 for the police to respond to the situation.  Noss, however, believes that plaintiff failed to evaluate and react to that situation, and he thinks it is possible that her reaction could have placed people's lives in jeopardy.  Noss reported this incident to Smolecki before plaintiff was terminated.

As another example of plaintiff's reaction to stressful situations, Smolecki testified that he was told on several occasions that plaintiff did not have control of the organization during fire alarms, although Smolecki did not personally witness such behavior.  Also, on April 14, 2005, plaintiff sent Smolecki an email stating that she "started feeling physically bad and a bit mentally overwhelmed."  She described "too many people coming to [her] asking what is going on and what is next" and that she "needed a mental break, went home, passed out."  Plaintiff characterizes this email as a "healthy response" to the situation.

### Problems with Defendant's Services to its Client

Also in March 2005, Noss was unhappy with the guard services provided by defendant. Noss therefore decided to perform a security audit that would allow him to get a comprehensive look at the service level defendant was providing and to document that level of service so that he could present the findings to defendant in order to bring the service back up to a level where it

4

needed to be.  After the audit was performed, Noss met with several of defendant's employees, including plaintiff, to give them a "high level brief" of the findings.  He told them that the performance during the audit was "horrible."  Smolecki described this audit as an "embarrassment" and the "linchpin" that put defendant on notice that Sprint would terminate their services unless there was improvement.

On March 31, 2005, Matt McCracken, defendant's Vice President for National Accounts, sent a "Performance Improvement Plan" to Darrel Carter, one of the contacts at Sprint regarding the account.  This plan was also sent to three of defendant's employees—Smolecki, Tony Smalls, and Brad VanHazel.  This Performance Improvement Plan was described as an executive summary of the service improvement plans for the Sprint account that would be presented in detail on April 8, 2005.  The first item in the Performance Improvement Plan states that "[o]ver the next 30 days, all three Account Managers at the World Headquarters are to be phased out and replaced with qualified, motivated, and skilled individuals."  The three account managers referred to in the Performance Improvement Plan were Fred Cox, Kelli Bailiff, and plaintiff.

After a meeting on April 8, 2005, defendant prepared a document titled "Securitas Performance Improvement Plan" that listed several tasks including "remove NCC Account Manager" that was to be completed by May 13, 2005.  On or after April 27, 2005, Smolecki updated the plan in a spreadsheet listing descriptions of "action items."  One of these items was "Remove NCC Account Manager."  The spreadsheet listed an initiation date of April 1, 2005 and an estimated completion date of April 29, 2005 for this "action item."  The plan was updated again on May 4, 2005, and the spreadsheet again listed "Remove NCC Manager" as an "action item" with an initiation date of April 1, 2005 and an estimated completion date of April 29,

2005.

Because of concerns with defendant's performance, including the poor results of the security audit conducted by Noss, Bob Dewald, Manager of the Asset Protection Group for Sprint, drafted a letter to defendant. This letter, dated April 21, 2005, notified defendant that its performance was not in accordance with the parties' contract and gave defendant an opportunity to improve the performance level before Sprint would terminate its services under the contract. As such, during the months of April and May 2005, it was important that defendant improve its performance.

### *April 1 Memo*

On April 1, 2005, about one week after he began supervising plaintiff, Smolecki gave plaintiff a memo ("the April 1 memo") in which he set forth his expectations in terms of leadership, mentoring, and performance criteria, specifically detailing his criticisms of her job performance. One of the purposes of the April 1 memo was to "provide specific counseling and accomplishments, changes in activity and deliverables which must be made." Smolecki stated in the April 1 memo: "Were I to evaluate your performance over the last month that I have been here, I would rate you as marginal to unacceptable. This is based solely on the one week that you have performed under my charge." Specifically, Smolecki criticized plaintiff for: calling his superiors to question his decisions instead of discussing such matters with him; making comments such as "It's common courtesy to ask the managers" and "I got my threat letter" in a loud voice in front of other employees; failing to visit each shift once a week, every week; making promises that she could not keep in regards to the replacement of employee shirts; failing to implement some of the "directions" he had asked; and voicing comments tinged with

6

disrespect and anger.  Smolecki also listed other areas that needed improvement such as: requiring officers to receive all of their training and keep it updated; passing on information to officers or the client contact when requested; creating contingency plans for certain situations, such as when there is a person with a gun; and learning and understanding how the fire alarm system works.  Smolecki also stated to plaintiff in the April 1 memo that "[i]t is incomprehensible to me that in knowing the account is in jeopardy, you still choose to go about your business as if what you have been doing is acceptable and there is nothing is [sic] wrong."

At the close of the April 1 memo, plaintiff was directed to provide a written response detailing what she will do to improve service in terms of personal and professional changes. Also, plaintiff was to tell Smolecki why she is the "best person for the job" and whether she felt that she could "make a difference."  Smolecki's intent in sending the April 1 memo to plaintiff was to provide a legitimate counseling attempt to help her do a better job in her position as NCC Manager.  Smolecki also testified that it was his expectation that if plaintiff did a good job, she would remain employed by defendant.

Regarding the criticisms in the April 1 memo, plaintiff admits that she complained about Smolecki's decisions to employees working beneath her, but she states that she never used any disrespectful words about Smolecki.  Plaintiff also admits that she did question the "call-in procedure" to Noss, and afterwards Noss stopped the procedure.  On one occasion, Noss overheard plaintiff complaining about the call-in procedure and saying that she was "sick and tired of Matt Smolecki getting into her business and that she ran the command center and who the fuck did he think he was."  Afterwards, Noss told Smolecki that plaintiff had made "inappropriate" comments in front of the employees, but he did not give him the specifics of her

comments.  Plaintiff also admits that she filled out an order form for the replacement of employee shirts, but that she was ordered to do so by either Tony Smalls, the National Account Manager, or someone else at the branch office.

After plaintiff received the April 1 memo, she read and signed it.  Plaintiff remembers reading the last part of the April 1 memo in which Smolecki asked her to provide a written response to the memo stating what she will do to improve service.  Later, plaintiff sent Smolecki an email stating that she would need additional time to respond to the April 1 memo.  Smolecki then emailed plaintiff on Monday, April 11, 2005, asking her to provide her response by close of business on Tuesday, April 12, 2005.  Plaintiff replied to Smolecki's email that she did not realize that there was a deadline for giving him her response and that she had been working on it with her church counselor.  Plaintiff "did not know how to respond" but stated that she would "give it a shot."  On April 9 and 12, 2005, plaintiff sent approximately fifty-seven emails from her work computer to her home computer, that took time, as plaintiff admits, that she could have used to prepare a written response to the April 1 memo.  Defendant contends that plaintiff was "stealing records" and violating company policy by sending these emails, some of which were marked "confidential," to her home computer.  However, defendant also admits that it did not know that plaintiff had sent these emails until after she was terminated from her employment.[2]

On April 14, 2005, two days after the deadline, Smolecki sent plaintiff an email stating that he had not yet received her response.  Plaintiff responded that she had worked on her response on April 12, 2005.  However, plaintiff never provided Smolecki a written response to the April 1 memo.  Plaintiff testified that she prepared a written response but that she never had

---

[2](Doc. 81 at 35.)

the opportunity to give it to Smolecki before she was terminated on May 10, 2005, over a month after she received the April 1 memo.

### *Other Reviews of Plaintiff's Performance*

Prior to April 1, plaintiff had never received any verbal counseling from Smolecki, but Smolecki did remember sending some emails to plaintiff criticizing her work performance before he issued the April 1 memo.  Previously in her employment with defendant, plaintiff had received positive verbal reviews of her performance from David Vogel, her former Branch Manager, and Tony Smalls.  In February 2005, when Brandon Swartzlander was serving as Branch Manager, he performed an analysis of defendant's staff and reported that defendant had "the right people in place."  Also, in March 2005, Smalls created an action plan for training and an action plan for recruiting, and neither of these plans reported any performance problems with plaintiff.

Defendant has a policy of documenting performance concerns as part of the discipline process.  Defendant also uses a "counseling and coaching" policy in training its managers to improve their employees' performances.  Under that policy, the first level of discipline is a verbal warning given to an employee and then put into writing by the manager for the employee's file.  The second level of discipline is a written warning.  However, depending on the severity of the issue, managers may skip levels of discipline up to termination.  Before Smolecki became the Branch Manager, plaintiff reported to six different persons who served as branch managers, none of whom documented any performance problems with plaintiff under this policy.

### *Advertisement of the NCC Manager Position*

On April 19, 2005, defendant placed an advertisement on Monster.com to hire a NCC Manager.  When plaintiff learned that her job was being posted on Monster.com, she contacted Tamiko Brown, defendant's Human Resource Manager assigned to the Sprint branch, to ask if she was being terminated.  Brown was unaware that the NCC Manager position was being advertised.  Only Brown or the Branch Manager had authority to post the NCC Manager position on Monster.com.  Brown then contacted Smolecki to see if he was aware of this job posting, and Smolecki told Brown that McCracken ordered him to look for a new person for the NCC Manager position.  Brown played no role in the decision or the approval of the decision to terminate plaintiff.

### *Plaintiff's Termination*

On May 10, 2005, plaintiff received a letter from Smolecki in which he informed plaintiff of her termination and the reasons for the decision including: after discussing performance concerns, plaintiff had not shown enough improvement to warrant retention of her employment; the feedback that Smolecki had requested from plaintiff had been continually ignored; plaintiff had not promoted strong communication or brought the teamwork or operations to a satisfactory level of performance; plaintiff had not projected the kind of image that would cause management to conclude that she had the necessary leadership abilities and qualities to succeed; the Sprint account was not getting sufficient and proper attention; and overall defendant was dissatisfied with how plaintiff had managed the Sprint account.  Smolecki testified that his decision to terminate plaintiff was led by the fact that plaintiff had not responded to the April 1 memo and that there were continued issues with plaintiff's behavior in front of her employees, the performance of the operations of the NCC, and the direction of the security officers.

10

After plaintiff's termination, she was temporarily replaced by a woman named Charlotte Vincent. Smolecki requested that Vincent submit an application for the permanent NCC Manager position, but Vincent declined. Smolecki then interviewed another woman, whom he wanted to hire as the NCC Manager, but the Human Resources Department could not locate her after her initial interviews. Defendant eventually hired a male to replace plaintiff as the NCC Manager.

### *Treatment of Other Account Managers*

Fred Cox, the Off-Campus Account Manager, received a counseling memo from Smolecki, similar to the April 1 memo that plaintiff received. The memo to Cox rated his performance as "needs improvement." This memo was the second written counseling issued to Cox. On December 28, 2004, Smalls gave Cox a "Performance Review & Improvement Plan" that listed areas in which Cox could improve his overall performance. On April 12, 2005, Cox provided Smolecki with a written response to his memo. Smolecki was satisfied with Cox's written response, and Cox retained his employment with defendant.

Kelli Bailiff was the Campus Account Manager. Like plaintiff, Bailiff was also supervised by Smolecki, starting in the last few days of March 2005. Bailiff also received a memo from Smolecki on April 1, 2005, about a week after he began directly supervising her, that provided counseling regarding her job performance. Prior to April 1, Smolecki had never provided Bailiff with any written criticism or complaints. Bailiff also had never received any written criticism or discipline from any of the previous six branch managers who supervised her performance. On April 6, 2005, defendant terminated Bailiff for poor job performance that included the "horrible" results of the security audit conducted by Noss. Afterwards, defendant

11

replaced Bailiff with a man.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[4]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[5]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[6]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[7]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[8]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[9]  If this initial burden is met, the nonmovant must then "go beyond

---

[3]Fed. R. Civ. P. 56(c).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Id.*

[6]*Id.* at 251–52.

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[8]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[9]*Id.*

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[11]

## III.    Analysis

Plaintiff brings a claim under Title VII alleging that she was terminated from her employment based on her gender.  Title VII of the Civil Rights Act makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."[12]  Absent any direct evidence of discrimination because of an employee's sex, the Court will employ the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*[13] and *Texas Department of Community Affairs v. Burdine.*[14]  Under this framework, plaintiff must first prove a prima facie case of discrimination.[15]  If plaintiff is able to sustain this burden, the burden of production shifts to defendant to "articulate a legitimate, nondiscriminatory reason for rejection."[16]  If defendant sustains this burden, the burden of production shifts back to plaintiff to show that defendant's

---

[10]*Id.*

[11]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[12]42 U.S.C. § 2000e-2(a)(1).

[13]411 U.S. 792 (1973).

[14]450 U.S. 248 (1981).

[15]*Id.* at 252–53; *McDonnell Douglas*, 411 U.S. at 802.

[16]*McDonnell Douglas*, 411 U.S. at 802.

proffered reason for rejection is false, or merely a pretext, and the presumption of discrimination created by establishing a prima facie case "drops out of the picture."[17]  Although the burden of production shifts back and forth between the parties, the ultimate burden of persuasion remains at all times with plaintiff.[18]

Establishing a prima facie case is "not an onerous burden," and gives rise to an inference of discrimination by eliminating the most common nondiscriminatory reasons for plaintiff's treatment.[19]  Generally, to establish a prima facie case of wrongful termination under Title VII, a plaintiff must show that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job; (3) despite these qualifications, plaintiff was discharged; and (4) the job was not eliminated after plaintiff was discharged.[20]  In this case, only the second element is in dispute as defendant argues that plaintiff was not qualified for the NCC Manager position, and therefore, she cannot establish a prima facie case.  To support this argument, defendant contends that plaintiff was unable to keep her composure in stressful situations, as required by the job position description.  Defendant points to three specific incidents to show her lack of composure in stressful situations: (1) the incident when two individuals entered the Sprint parking lot dressed in camouflage and carrying rifles; (2) plaintiff's command and control of the organization during fire alarms; and (3) the email that plaintiff sent to Smolecki stating that she was "mentally overworked" and that she "needed a mental break, went home, passed out."  However, these

---

[17]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

[18]*Burdine*, 450 U.S. at 253.

[19]*Id.* at 254.

[20]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999)).

specific incidents are more appropriate for the Court to consider under the pretext analysis below because as the Tenth Circuit has explained, "'proof of competence sufficient to make out a prima facie case of discrimination was never intended to encompass proof of superiority or flawless performance.  If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing.'"[21]

Rather, plaintiff can satisfy her burden of making out a prima facie case of discrimination by presenting credible evidence that "she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."[22]  Plaintiff's burden in establishing a prima facie case is not "intended to be rigid, mechanized, or ritualistic."[23]  Here, plaintiff has met her burden through her own testimony that her work was satisfactory.  Contrary to defendant's assertions, plaintiff testified that she never had a hard time maintaining her composure during stressful situations when she was employed by defendant and that she never told any supervisory or management employee of defendant or Sprint that she had trouble maintaining her composure during stressful events.  Moreover, plaintiff had held her job for over a year before she was terminated, and during that time she never received any written counseling or discipline from her supervisors regarding a failure to keep her composure during stressful events before she received the April 1 memo from Smolecki.  In fact, plaintiff had never received any written counseling or discipline regarding

---

[21]*Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1421 (10th Cir. 1991) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978), *cert. denied*, 439 U.S. 984 (1978)).

[22]*MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (citations omitted).

[23]*Id.* (quotations omitted).

any aspect of her job performance before she received the April 1 memo.  Thus, the Court concludes that plaintiff has presented sufficient evidence to establish a prima facie case.

The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for plaintiff's termination.  Defendant asserts that it terminated plaintiff's employment because "she (1) failed to respond to her boss's counseling memo, (2) disobeyed her boss's orders, (3) made disrespectful and disparaging comments about her boss in front of other employees, (4) abandoned her job during a stressful time when she was needed, (5) stole company records by emailing them to herself to provide Ms. Bailiff, and (6) failed to adequately supervise and train her staff, all in violation of plaintiff's job description."[24]  These are all legitimate, nondiscriminatory reasons for defendant to terminate plaintiff's employment.

Thus, to survive summary judgment, plaintiff must show that defendant's proffered reason is pretextual.[25]  Plaintiff may establish pretext by demonstrating "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief."[26]  Plaintiff asserts that the following evidence demonstrates pretext: (1) defendant made the decision to terminate plaintiff on March 31, 2005, before she had ever been disciplined for any performance deficiencies, and (2) defendant's stated reasons for her

---

[24](Doc. 71 at 23.)

[25]*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) (citing *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995)).

[26]*Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

termination are controverted by the record.[27]  The Court agrees that this is sufficient evidence to establish pretext, and therefore defendant is not entitled to summary judgment on plaintiff's claim.

First, plaintiff has set forth sufficient evidence that defendant made the decision to terminate plaintiff on March 31, 2005, before she had ever received any written counseling or discipline for any performance deficiencies and before she was actually terminated on May 10, 2005 by Smolecki.  Plaintiff has submitted evidence of a "Performance Improvement Plan" that was sent to Sprint by McCracken on March 31, 2005, and states that "[o]ver the next 30 days, all three Account Managers at the World Headquarters are to be phased out and replaced with qualified, motivated, and skilled individuals."  Smolecki testified that one of the three account managers that document referred to was plaintiff.  As defendant continued to implement its Performance Improvement Plan, additional documents were created that indicated that it planned to terminate the NCC Manager.  Sometime after April 8, 2005, defendant prepared a document titled "Securitas Performance Improvement Plan" that listed "remove NCC Account Manager" as a task to be completed by May 13, 2005.  When the plan was again updated on or after April 27, 2005, "Remove NCC Account Manager" was listed as an "action item" with an initiation date of April 1, 2005 and an estimated completion date of April 29, 2005.  When the plan was updated again on May 4, 2005, "Remove NCC Manager" was again listed as an "action item" with the same initiation and completion dates.  Also, on April 19, 2005, defendant began

---

[27]As additional evidence of pretext, plaintiff also claims that defendant's treatment of Bailiff, another female employee, is relevant to show sex discrimination.  Because the Court concludes below that plaintiff has presented sufficient evidence to establish pretext, the Court declines to address whether defendant's treatment of Bailiff provides additional evidence of sex discrimination, especially when Bailiff has her own discrimination action pending against defendant in Case No. 06-2225-JWL.

advertising the NCC Manager position on Monster.com.  When defendant's Human Resource

Manager inquired about this open position being advertised, Smolecki reported that McCracken

had ordered him to look for a new person for the NCC Manager position, although plaintiff was

not terminated from that position until May 10, 2005.

Defendant, however, argues that the Performance Improvement Plan was a fluid

document subject to change.  Further, defendant contends that it was not unlawful for its

company to decide to terminate plaintiff, but then re-evaluate its decision and/or give the

employee another opportunity to improve her job performance.  As an example, defendant

argues that the Performance Improvement Plan was subject to change as evidenced by the fact

that defendant named Cox as an employee who would be terminated in the March 31, 2005

document, but because Cox, unlike plaintiff, responded positively to the counseling memo that

he received, he retained his employment with defendant.  While it is a legitimate argument for

defendant to contend that the Performance Improvement Plan was a fluid document subject to

change and that plaintiff could have remained employed had she responded to the April 1 memo

as did Cox, it would also be reasonable for a jury to find that defendant's proffered reason is

pretextual when there is evidence documenting McCracken's decision to terminate plaintiff as

early as March 31, 2005.  This creates a fact issue for the jury to resolve, and therefore defendant

is not entitled to summary judgment.

Second, plaintiff has established pretext by showing weaknesses and contradictions in

defendant's proffered reasons for her termination.  Defendant first claims that plaintiff was

terminated on May 10, 2005, for failing to respond to her boss's counseling memo of April 1,

2005.  However, as explained above, a reasonable jury may find that defendant's reliance on this

ground is pretextual when defendant created documents indicating that McCracken had already decided to terminate plaintiff on March 31, 2005, before plaintiff ever received the April 1 memo. This conflicting evidence in the record of when defendant decided to terminate plaintiff raises a fact issue for the jury. As the second reason for her termination, defendant asserts that plaintiff disobeyed her boss's orders. Plaintiff denies this assertion. While the decisionmaker, Smolecki, claims that plaintiff failed to pass on information regarding a "tour confirmation system" to Noss because "she didn't have the time," plaintiff denies that she was ever told to pass on this information to Noss, and she contends that she never made the statement that "she didn't have the time." Smolecki also claims that plaintiff failed to turn over documents to Smalls, but plaintiff also denies this. Because there is conflicting evidence in the record regarding whether plaintiff failed to follow Smolecki's orders, a reasonable jury may find that defendant's second proffered reason, that plaintiff failed to follow her boss's orders, is pretextual.

Defendant's third reason for plaintiff's termination is that she made disrespectful and disparaging comments about her boss in front of other employees. Plaintiff also denies this statement. While plaintiff admits that she complained about Smolecki's decisions to employees working beneath her, she states that she never used any disrespectful words about Smolecki. Plaintiff also admits that she did question the "call-in procedure" to Noss, and afterwards Noss stopped the procedure. There is evidence in the record that Smolecki was told of plaintiff making "inappropriate" comments such that this would be a plausible reason for defendant to terminate plaintiff. "'[A]s a general rule, an employee must proffer evidence that shows each of

the employer's justifications are pretextual.'"[28]   However, the Tenth Circuit has recognized that "'when the plaintiff casts substantial doubt on many of the employer's multiple reasons [for termination], the jury could reasonably find the employer lacks credibility.  Under those circumstances, the jury need not believe the employer's remaining reasons.'"[29]  As shown both above and below with defendant's other proffered reasons, this is the type of case in which "the employer offers a plethora of reasons, and the plaintiff raises substantial doubt about a number of them."[30]  Particularly, plaintiff has cast doubt on whether she was terminated for failing to respond to the April 1 memo when there is evidence that McCracken had already made the decision to terminate her employment the previous day.  Thus, by "casting doubt on a particular justification," plaintiff has "necessarily call[ed] into doubt the other justifications," thereby "demonstrating that reason to be pretextual" which is "enough to avoid summary judgment."[31]

As the fourth reason for her termination, defendant claims that plaintiff abandoned her job during a stressful time when she was needed.  As plaintiff correctly points out, there is no evidence in the record to support this claim.  On April 14, 2005, plaintiff sent Smolecki an email stating that she "started feeling physically bad and a bit mentally overwhelmed" and that "too many people coming to [her] asking what is going on and what is next" and that she "needed a mental break, went home, passed out."  While this is evidence that plaintiff left her job at a certain time, a factfinder may reasonably conclude that this email does not show that she

---

[28]*Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1309–10 (10th Cir. 2005) (quoting *Tyler v. RE/MAX Mt. States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (further citations omitted).

[29]*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005) (quoting *Tyler*, 232 F.3d at 814).

[30]*Jaramillo*, 427 F.3d at 1310 (citing *Tyler*, 232 at 814).

[31]*Bryant*, 432 F.3d at 1127 (citing *Tyler*, 232 F.3d at 814).

"abandoned her job during a stressful time."  Further, a reasonable jury may reject this proffered

reason for plaintiff's termination when there is evidence documenting defendant's decision to

terminate plaintiff beginning on March 31, 2005, before plaintiff ever sent this email.

Defendant's fifth reason for plaintiff's termination is that she stole company records by

emailing them to herself.  But, as stated above, defendant admits that it did not even know that

plaintiff had sent these emails to herself until after her termination.  As such, this was not a

reason for her termination.  Defendant states in its reply that it is not relying on plaintiff's emails

to show why it terminated plaintiff, but instead that plaintiff spent time emailing documents to

herself rather than working on a response to the April 1 memo.  However, defendant listed this

reason as one of the six legitimate, nondiscriminatory reasons for terminating her employment.[32]

The fact that defendant lists this *post-hoc* reason for plaintiff's termination creates an issue for

the jury.[33]

And finally, defendant contends that plaintiff failed to adequately supervise and train her

staff.  Plaintiff denies this allegation and states that there is no evidence of that fact in the record.

Defendant points to the April 1 memo for support.  However, the April 1 memo does not criticize

plaintiff for failing to "adequately supervise and train her staff."  Rather, a reasonable jury could

interpret Smolecki's April 1 memo as listing an area that could be improved when he stated that

"officers must get all their training completed and keep it updated" and that plaintiff needed to

visit "each shift once a week, every week."  Defendant also points to plaintiff's email on April

---

[32](Doc. 71 at 23.)

[33]*See Plotke v. White*, 405 F.3d 1092, 1103 (10th Cir. 2005) (stating that defendant's *post-hoc* reasons for plaintiff's termination, that predated the incident giving rise to plaintiff's termination, constituted evidence of pretext).

14, 2005, in which she stated that she "needed a mental break, went home, passed out."  As stated above, this email may show that plaintiff left work at a certain time, but a reasonable jury could find that this single email is not sufficient evidence that defendant terminated plaintiff because she failed to adequately train and supervise her staff.  Thus, plaintiff has provided evidence to demonstrate that defendant's proffered reasons for her termination are pretextual.

Further, plaintiff has created a genuine issue of fact as to defendant's other complaints about her job performance, although not listed as reasons for her termination.  In the April 1 memo, Smolecki criticized plaintiff for making promises to the employees about the replacement of their shirts.  However, plaintiff contends that she was ordered to fill out the form for the replacement of employee shirts by either Smalls or someone else at the branch office.  Defendant also contends that plaintiff was not properly monitoring the digital video system to determine if it was correctly retaining security video.  Defendant had a policy of retaining surveillance video for thirty days, and it was plaintiff's responsibility to ensure that the system was operating correctly.  At some point, Noss learned that the video was only being retained for seven days.  When he questioned plaintiff about this, she told him that when Sprint changed the surveillance recording system from video to digital format, she did not receive any direction on what needed to be done nor did she ask anyone what was expected of her.  Noss reported plaintiff's explanation to Smolecki.  However, plaintiff contends that when the change from video to digital occurred, defendant no longer had access to the digital system and instead, it became a responsibility of Sprint's corporate security, rather than her responsibility, to store the surveillance video.  Plaintiff's testimony contradicts these additional criticisms that Smolecki had about plaintiff's job performance, enough to create a fact issue for the jury.

Additionally, defendant listed three occasions in which it contends plaintiff failed to maintain her composure during stressful situations as a reason for why she was not qualified for the position to establish a prima facie case. But defendant does not list this reason as one of the grounds for plaintiff's termination. However, even considering these three occasions, which include the incident when two individuals entered the Sprint parking lot dressed in camouflage and carrying rifles, plaintiff's command and control of the organization during fire alarms, and the email that plaintiff sent to Smolecki stating that she was "mentally overworked" and that she "needed a mental break, went home, passed out," plaintiff has raised substantial doubt about a number of defendant's proffered reasons for her termination,[34] particularly by providing evidence that McCracken made the decision to terminate plaintiff on March 31, 2005, before she ever received any documented criticism or discipline from her employer regarding her job performance and before she was actually terminated by Smolecki on May 10, 2005. As such, plaintiff has called into doubt defendant's other justifications for her termination, including her failure to maintain her composure under stressful situations, if that is one of defendant's justifications. This is sufficient to establish pretext and to avoid summary judgment on plaintiff's gender discrimination claim.[35]

As set forth above, plaintiff has presented sufficient evidence to withstand defendant's motion for summary judgment. The Tenth Circuit has explained that "'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false,

---

[34]*Jaramillo*, 427 F.3d at 1310 (quoting *Tyler*, 232 F.3d at 814).

[35]*Bryant*, 432 F.3d at 1127 (quoting *Tyler*, 232 F.3d at 814).

may permit the trier of fact to conclude that the employer unlawfully discriminated.'"[36]  "The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination."[37] Here, plaintiff has established a prima facie case, along with sufficient evidence of pretext to create a genuine issue of fact for the jury.  Accordingly, defendant's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 70) is **DENIED.**

**IT IS SO ORDERED**.

Dated this 28th     day of June 2007.

                                          S/ Julie A. Robinson

                                        Julie A. Robinson
                                        United States District Judge

Memorandum and Order Denying Defendant's Motion for Summary Judgment, *Becker v. Securitas Security Services, USA, Inc.*, No. 06-2226

---

[36] *Doebele v. Sprint United/Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

[37] *Id.* at 1135–36 (citing *Reeves*, 530 U.S. at 146–49.)